IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| RUSSELL STEEDLEY, | ) |
|---|---|
| Plaintiff, | ) ) ) |
| v. | ) Civ. Action No. 10-215-GMS ) |
| JAMES MCBRIDE, et al., | ) ) |
| Defendants. | ) |

**MEMORANDUM**

The plaintiff, Russell Steedley ("Steedley"), an inmate at the James T. Vaughn Correctional Center ("VCC), Smyrna, Delaware, filed this lawsuit pursuant to 42 U.S.C. § 1983, (D.I. 2.) He appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. (D.I. 9.) The case proceeds on the amended complaint. (D.I. 31.) Pending before the court are Steedley's motion to compel, motion for continuance, and motion to extend time to file a reply brief (D.I. 113, 122, 126) and the defendants' motions for summary judgment (D.I. 117, 118.)

## I. FACTUAL AND PROCEDURAL BACKGROUND

Steedley alleges that he has two distinct lumps on his body that have grown unchecked for years and, while all physicians who have examined him have recommend that he see an expert to remove and/or test the lumps for cancer, the defendants have denied him the recommended medical treatment. On June 1, 2010, the court screened the original complaint and dismissed it as frivolous and for failure to state a claim under § 1915(e)(2)(b) and § 1915A(b)(1). (D.I. 14.) Steedley appealed and the matter was remanded for consideration of whether Steedley should be allowed amend the complaint. (D.I. 23.) Steedley filed an amended

complaint. (D.I. 31.) The matter proceeds against the defendants James MacBride, M.D. ("Dr. MacBride"),[1] Corizon, Inc., f/k/a Correctional Medical Services, Inc. ("CMS"), and Correct Care Solutions, Inc. ("CCS"), all other defendants having been dismissed. (*See* D.I. 31, 111.)

Steedley has been housed at the VCC since June 1990. (D.I. 31, ¶3.) CMS provided health care service at the VCC from July 1, 2005 through June 30, 2010. *Parkell v. Danberg*, 21 F. Supp. 2d 339 (D. Del. 2014). Dr. MacBride, who is the former regional medical director for CMS,[2] began his tenure in Delaware during April 2009. (D.I. 119 ex. A, ¶2.) CCS provided health care service at the VCC from July 1, 2010 through June 30, 2014. *Taylor v. Correct Care Solutions*, 2015 WL 602873 (D. Del. 2015).

On October 15, 2007, a surgical consultation request was submitted for Steedley to undergo a biopsy of a mass on his right neck to rule out malignancy. (D.I. 43.) A CT scan performed on December 10, 2007 revealed a right neck mass. (D.I. 119 ex. A at ¶ 5.) Steedley was seen by Dr. Levente Szalai ("Dr. Levente Szalai") on March 12, 2008. With regard to the neck mass, Dr. Szalai stated that Steedley had the condition "for probably all of his life, although it had just grown recently in size." (D.I. 43.) Examination revealed a "right neck mass which measures 1.5 x 1.5 cm at its greatest diameters, which is smaller than 3 months ago." He opined that the mass "is most likely benign" and that the CT scan is essentially negative. *Id.* Dr. Szalai recommended an MRI rather than a surgical biopsy and to proceed with a biopsy only if the MRI indicated it. *Id.* An MRI performed in March 2008 was consistent with lipoma making a biopsy unnecessary. (D.I. 119 ex. A at ¶ 5.)

---

[1]MacBride is improperly named as James McBride.

[2]His region included Delaware.

2

A consultation request was submitted in April 2009. (D.I. 129 at CCS 0679.) Dr. MacBride's April 30, 2009 note on the request states that he discussed the issue with the surgeon and was resubmitting for surgical biopsies in two areas, with a reevaluation after the biopsy diagnoses. (*Id.*)

August 13, 2009 medical notes refer to a lump on Steedley's neck and a lump on his left hip and flank. (D.I. 29.) The notes state that the neck lump has been there for 30 years and the lump on his flank has been there since 2004. (*Id.*) Steedley was seen by medical on September 25, 2009. (D.I. 129 at CCS 00814.) A consultation request for an excisional biopsy was approved on October 15, 2009. (*Id.* at CMS 00487.)

Steedley was seen by outside physician Dr. Barnett ("Dr. Barnett") on November 3, 2009, for evaluation of several subcutaneous masses including an area to the left hip and flank and an area on the right neck. (D.I. 29; D.I. 119 ex. A at ¶ 6.) Examination revealed soft, fleshy subcutaneous masses most consistent with lipomas in the area of the left hip/flank and right neck. (*Id.*) It was recommended that Steedley have the areas excised as an outpatient. (D.I. 29.) In early January 1, 2010, nurse practitioner Ihuoma Chuks ("Chuks") submitted a written consultation request for Steedley to undergo an excisional biopsy as recommended by Dr. Barnett. (*Id.*) Dr. Dale Rodgers ("Dr. Rodgers"), the site medical director, signed the consultation request on January 12, 2010. (D.I. 119 ex. A at ¶ 7.)

According to Dr. MacBride: (1) lipoma is a slow-growing, fatty lump that is most often situated between your skin and the underlying muscle layer; (2) it is often easy to identify because it moves readily with slight finger pressure; (3) it is not cancer and is usually harmless; and (4) treatment generally is not necessary, but if the lipoma is painful or is growing, it can be

3

removed. (*Id.*) Dr. Barnett's notes recommend excision as an outpatient but, according to Dr. MacBride, consultation notes by an outside provider are only recommendations and not requirements. *Id.* Steedley was seen by medical on December 29, 2009 for follow-up on the neck mass. (D.I. 129 at CCS 0078.)

Dr. MacBride performed a utilization management review of Steedley's case in mid-January 2010. (*Id.* at ¶ 7.) Utilization management is a medical industry term referring to the process that helps ensure that patients receive the right care at the right time in order to improve clinical outcomes and lower costs. (*Id.* at ¶¶ 3, 8.) According to Dr. MacBride, the goal and purpose of a utilization management review is to assure that appropriate care is received. (*Id.* at ¶ 8.) Dr. MacBride states that Steedley's utilization managment review sought to assure that services provided him were efficient, cost effective, and consistent with recognized standards of care. (*Id.*) Dr. MacBride wrote on the consultation request in the "alternative treatment plan for consideration" section, "lipomas excision not medically necessary provider to monitor." (D.I. 116.)

Dr. MacBride opines that: (1) the utilization management review utilized by CMS as applied to Steedley's medical care was consistent with the health care industry; (2) the utilization management review did not result in Steedley receiving medical care that was less than appropriate or less than demanded by the applicable standard of medical care; (3) Steedley received care that was appropriate for his medical condition; and (4) up through June 30, 2010, Steedley had only lipomas, the masses were not cancerous, and needed only to be monitored. (*Id.* at ¶ 9.) According to Dr. MacBride, Steedley's medical records indicate that he was monitored by medical providers at least up through June 30, 2010, after said time CMS and Dr.

4

MacBride no longer provided medical care to the Delaware Department of Corrections ("DOC"). (*Id.* at ¶ 8.) (*Id.*)

On May 22, 2011, Steedley submitted a medical grievance complaining that when he presented for his last two chronic care appointments, the examining physician, Dr. Linda Surdo-Galef ("Dr. Surdo") failed to examine or ask Steedley about the lumps. (D.I. 125, ex. C.) In his grievance, Steedley states there that is continuous growth and pain from both lumps and they are not being monitored by the medical staff. (*Id.*) On May 23, 2011, Steedley complained to the U.S. Department of Justice that Dr. Surdo failed to examine his lumps at his last two chronic care appointments. (D.I. 125, ex. D.) He stated that Dr. Surdo lacks the expertise and proper testing equipment to adequately examine the lumps and that neither Dr. Surdo nor anyone at the prison is qualified to do so. (*Id.*) Steedley next complained to Jim Welch ("Welch"), medical director for the DOC, that Dr. Surdo would only monitor and recognize his hypertension as a chronic condition and that he would need to file separate appointments with regard to his two lumps. (*Id.* at ex. E.) Dr. Surdo advised Steedley that she did not recognize the lumps as chronic conditions. (*Id.*)

In the amended complaint, Steedley alleges that Dr. MacBride knowingly employed and acquiesced in the unconstitutional policies/customs of CMS with deliberate and callous indifference to Steedley's known serious medical needs and failed to adhere the recommendation of an expert. (D.I. 31, Count II.) Steedley alleges that CMS and CCS promulgated policies and customs denying him: (1) access to timely and adequate medical care that was prescribed by an expert, and (2) access to an expert for treatment and devices to test or treat his medical condition. (D.I. 31, Counts I, V.) In addition, he alleges that they both employed and ratified their

employees' actions as defacto gatekeepers who followed the practices, policies and/or customs denying him access to necessary care which was recommended by an oncologist. (*Id.* Counts III, VI.) Steedley seeks injunctive relief, as well as compensatory and punitive damages.

## II. MISCELLANEOUS MOTIONS

### A. Motion to Compel

Steedley moves to compel CMS to provide answers to interrogatories, admissions, and production of document requests, which Steedley claims were not adequately answered. (D.I. 113.) CMS and MacBride oppose the motion and respond that they have adequately responded to the discovery requests, just not to Steedley's satisfaction.

Pursuant to Fed. R. Civ. P. 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1).

Steedley takes exceptions to the objections to his discovery and seeks more complete responses to interrogatories 1, 2, 3, 4, 10, 12, 13, 15, and 17. He also takes exceptions to the defendants' responses to admissions 5, 6, 7, 8, 9, 19, 20, 21, 25, and 27. Steedley claims that the answers to interrogatories and responses to admissions are contradictory.

The court has reviewed the defendant's responses and objections. While objections were

made, the defendants adequately answered the interrogatories and adequately responded to the requests for admissions. Therefore, the court will deny the motion to compel.

### B. Motions to Continue and for Extension of Time

Steedley filed a motion to extend discovery (D.I. 122) (titled as a motion for continuance) until the court ruled on his motion to compel. The motion will be denied, given the court's denial of the motion to compel, discussed in paragraph II.A. above.

Steedley also filed a motion for an extension of time to file a response to CMS' motion for summary judgment. (D.I. 126.) Steedley has filed an opposition to the motion for summary judgment, and the court will consider it timely filed. Therefore, the motion for an extension of time will be denied as moot.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'"

7

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### B. Medical Needs

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). However, "a prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. 2010) (unpublished) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). Moreover, allegations of medical malpractice are not sufficient to establish a constitutional violation. *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (citations omitted); *see also Daniels v. Williams*, 474 U.S. 327, 332-34 (1986) (negligence is not compensable as a Constitutional deprivation). Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

When a plaintiff relies upon a theory of respondeat superior to hold a corporation such as CMS or CCS liable, he must allege a policy or custom that demonstrates deliberate indifference. *Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *see Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (because respondeat superior or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Assuming the acts of employees of a corporate medical provider have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992) (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

### C. Discussion

#### 1. Dr. MacBride and CMS

Steedley alleges that the defendants are deliberately indifferent to his serious medical

needs (i.e., lumps on his neck and leg/hip area). More particularly, he contends that Dr. MacBride and CMS violated his constitutional rights by failing to authorize a medically prescribed biopsy. He argues that Dr. MacBride and CMS delayed and postponed recommended care and then, after approving the procedures, delayed more, and finally decided to forego the test and this constitutes deliberate indifference. Steedley also contends there was no medically sound reason for abandoning necessary preventive care beyond the fact that it saves money.

Dr. MacBride and CMS argue that summary judgment is appropriate because medical providers concluded the lumps were not cancerous and did not require surgery despite Steedley's demands for surgery and biopsies, Steedley provides no expert testimony that surgery was necessary for his condition, and Steedley has produced no admissible evidence to support his claims that CMS maintained a custom or policy that violated Steedley's constitutional rights. Dr. MacBride and CMS conclude that Steedley is "simply unhappy that he did not receive the surgery he wants despite it being medically unnecessary." (D.I. 119 at 5.)

With regard to Dr. MacBride, the evidence of record indicates that following a consultation request for an excisional biopsy, he performed a utilization management review, determined that a lipomas excision was not medically necessary, and recommended that the condition be monitored by the medical provider. In additional Dr. MacBride opined that the masses were not cancerous as of June 30, 2010, and needed only to be monitored. Finally, Dr. MacBride stated in his affidavit that Steedley's medical records indicated that Steedley was monitored at least up through June 30, 2010, the date that Dr. MacBride and CMS stopped providing medical care to the DOC.

The evidence of record does not support Steedley's claim that Dr. MacBride violated his constitutional rights. Steedley's claim that Dr. MacBride and CMS failed to authorize biopsies for cancer detection falls under the category of disagreement with treatment. His disagreement, however, does not translate into a constitutional violation by the defendants. In addition, the unrefuted evidence of record is that the masses at issue are not cancerous and that excisions were not medically necessary. Finally, the evidence of record indicates that during CMS' tenure as the medical care provider for the DOC, Steedley's condition was monitored.

Inasmuch as the court has concluded that CMS' employees did not violate Steedley's constitutional rights, CMS cannot be liable based on the theory that it established or maintained an unconstitutional policy or custom responsible for violating Steedley's rights. *See Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. 2007) (unpublished) (policy makers not liable in prison medical staff's alleged deliberate indifference to prisoner's serious medical needs, where, given that there was no underlying violation of prisoner's rights, policy makers did not establish or maintain an unconstitutional policy or custom responsible for violating prisoner's rights).

No reasonable jury could find that Dr. MacBride or CMS violated Steedley's constititutional rights. Therefore, the court will grant their motion for summary judgment. (D.I. 118.)

### 2.  CCS

Steedley contends that CCS has denied him any form of medical treatment, recommended

or otherwise, for both lumps.[1] CCS argues that Steedley has failed to present any evidence to support his theory that, despite receiving medical treatment, it has been deliberately indifferent to his medical conditions in light of the evidence that they are benign. CCS further argues that summary judgment is appropriate because Steedley failed to present any evidence that CCS maintained a policy or custom that deprived him of medical care.

Initially the court notes that the evidence of record as submitted by the parties does not speak to medical care provided to Steedley subsequent to June 30, 2010, when CCS became the medical care provider for the DOC, except to the extent that Steedley began complaining in May 2011 that the lumps had not been monitored by Dr. Surdo at his last two chronic care visits. The dates of those visits do not appear on the record. Dr. Surdo advised Steedley to submit separate appointment slips for the condition as she did not consider the lumps a chronic care issue. Steedley took exception to this apparent change in procedure. At most, the record reflects that, on two occasions, Steedley's lumps were not examined, and that Steedley was unhappy with the new procedures established by Dr. Surdo. The evidence of record does not support a conclusion that CCS was deliberately indifference to a serious medical need.

In addition, Steedley failed to present any proof to suggest that CCS maintained a policy of custom to deprive him of his constitutional rights. As discussed, CCS may be liable under § 1983 if it adopted a policy or custom that deprived Steedley of his constitutional rights. Steedley contends that CCS condoned the practice of its subordinates and that it could reasonably

---

[1]The amended complaint alleges, "[f]rom July 2010, to date, the plaintiff has attended numerous medical appointments, including chronic care appointments, which the lumps were initially categorized as benign, however, contrary to RMD McBribe's [sic] recommendations for monitoring, of the lumps by medical staff no such screening or examination has taken place, despite the urging by plaintiff to do so." (D.I. 31, ¶ 28.)

12

be assumed that CCS had a standing practice or custom of denying medical grievances that addressed the medical staff's denial of adequate or prescribed medical care.

There are "three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983," as follows: (1) where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself; and (3) where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need. *Natale*, 318 F.3d at 584 (internal quotations and citations omitted).

Steedley does not refer to a specific policy of CCS. Instead, he makes a bald assertion that CCS condones what he considers unconstitutional practices of its subordinates without providing any evidence in support of thereof.[4] Plaintiff "must present more than bare assertions" to survive a summary judgment motion. *Podobnik*, 409 F.3d at 594 (internal quotation marks and citation omitted); *see also Jackson v. Fauver*, 334 F. Supp. 2d 697, 718 (D.N.J. 2004) ("Unsupported allegations are not sufficient to survive a motion for summary judgment.").

Finally, Steedley has not shown that CMS refused to monitor the lumps once Steedley

---

[4]Steedley submitted the affidavits of other inmates with regard to the practices of CMS when providing health care (*see* D.I. 127, exs. 21-22), but did not submit similar affidavits with regard to CCS.

13

submitted a request for treatment pursuant to Dr. Surdo's new procedure. At most, the evidence is that once CCS became the health care provider, Steedley's condition was not monitored on two occasions when he was seen at the chronic care clinic. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 596 (7th Cir. 2003) (finding that "knowledge of two incidents of misconduct by correctional officers in a period of one year certainly fails to meet the test of a widespread unconstitutional practice by the jail's staff that is so well settled that it constitutes a custom or usage"). The evidence of record does not point to a systemic failure by CMS, but rather to the new procedure of Dr. Surdo with regard to treatment of chronic conditions.[5] Steedley has failed to present any proof that CCS has an illegal custom or policy that caused him constitutional harm. Therefore, the court will grant CCS' motion for summary judgment.

## V. CONCLUSION

For the above reasons, the court will: (1) deny the plaintiff's motion to compel, motion for continuance, and motion for an extension of time (D.I. 113, 122, 126); and (2) grant the defendants' motions for summary judgment (D.I. 117, 119).

An appropriate order will be entered.

UNITED STATES DISTRICT JUDGE

July 20, 2015
Wilmington, Delaware

---

[5]Steedley did not name Dr. Surdo as a defendant in this case. *See White*, 897 F.2d at 107 (When prison doctors or medical authorities deliberately ignore the orders of a prisoner's prior physician, such acts are sufficient to allege a violation of the Eighth Amendment. ).

14